Dana BLACKIE, et al., Plaintiffs,

v.

STATE OF MAINE, et al., Defendants.

Civ. No. 94–98–P–H.

United States District Court,
D. Maine.

June 23, 1995.

John R. Lemieux, Maine State Employees Ass'n, Augusta, ME, for plaintiffs.

Peter Brann, Asst. Atty. Gen., Augusta, ME, for defendants.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

HORNBY, District Judge.

In 1992, a number of state probation officers filed suit in this court seeking overtime compensation under the Fair Labor Standards Act ("FLSA"). They won. *Mills v. Maine*, 839 F.Supp. 3, 4–5 (D.Me.1993). Next, the State of Maine ended the sixteen percent salary premium all probation officers had previously received under the collective bargaining agreement as non-standard workers, and refused to negotiate a side agreement with the Maine State Employees Association ("Union") similar to those negotiated in 1985–1986 with other classes of law enforcement agents. The *Mills* plaintiffs and probation officer Dennis Becker then filed this suit, claiming that the State (and certain supervisors) had retaliated illegally against probation officers for filing the *Mills* suit. Both sides have moved for summary judgment. The relevant underlying facts are undisputed.

### BACKGROUND

There has been an Article 10.C.,[1] "Non–Standard Workweek," in the state employees' collective bargaining agreement since 1978. At that time, and before FLSA time-and-a-half overtime even applied to state employers, Article 10.C. provided that "non-standard" employees were to be compensated at a rate sixteen percent above their base wage. "Non-standard" employees were those whose working conditions required them to work a variable workweek over forty hours that was capable of being scheduled only by the employees themselves.

---

1. In the 1989–1992 collective bargaining agreement, Article 10.C. was renumbered to Article 11.C. The Article 10.C. designation resumed in the 1993–1995 contract.

In 1985, the United States Supreme Court applied the FLSA to the states. *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 555–57, 105 S.Ct. 1005, 1019–20, 83 L.Ed.2d 1016 (1985), *modified by* 42 U.S.C. § 2000d–7. The State of Maine then evaluated state government positions to determine which ones could be considered exempt from FLSA overtime coverage. Within the law enforcement services bargaining unit, the State concluded that probation officers, among others, qualified for exemption, but that game wardens, game warden specialists, fire investigators, motor vehicle investigators, forest ranger I's, II's and III's, forest watchpersons, liquor enforcement officer I's, marine patrol officers and marine patrol specialists were not exempt. During 1985 and 1986, the State negotiated side agreements with these other categories to ease their transition from exempt to non-exempt status. Under the side agreements, these categories of state employees relinquished the non-standard sixteen percent premium and became eligible for overtime (as defined in the FLSA). Their new salaries, however, were increased four percent, apparently as a concession for relinquishing the sixteen percent non-standard premium.

During the months of negotiations preceding adoption of the 1986–1987 collective bargaining agreement for the law enforcement services bargaining unit, the State and the Union hotly contested the relationship between FLSA overtime eligibility and non-standard status. Eventually, the parties agreed to add the following underlined language:

C.   Non–Standard Workweek

1.   Classifications *listed in Section 3* which meet the following criteria shall be designated as non-standard:

(a) *Positions in a classification have been determined by the Department of Personnel to be exempt for overtime compensation from the Fair Labor Standards Act;*

(b) Employees *are required by working conditions to* work a variable workweek in excess of forty (40) hours; and

(c) Employees' workweek *are* [sic] irregular *and* work hours cannot be scheduled or determined except by the employee.

2.   Employees in *a* classification *which is* designated as non-standard shall be compensated at a rate of sixteen percent (16%) above the basic rates in their salary grades, *except that any position that is found by the Department of Personnel not to be exempt from the Fair Labor Standards Act for overtime compensation purposes shall not be designated non-standard.*

3.   *The following classes are designated as meeting the above criteria:*

*Forest Ranger IV*

*Game Warden Pilot*

*Marine Patrol Pilot*

*Probation Parole Officer/Juvenile Caseworker*

*Probation Parole Officer II*

*Special Agent Investigator*

*Special Investigator*

State of Maine–MSEA Agreement, Law Enforcement Services, Art. 10.C. at 13–14 (1986–1987).

The parties dispute the effect this language has on Article 10.C.'s interpretation. The plaintiffs claim that once probation officers were specifically designated as non-standard in Section 3, that designation was to last for the life of the contract. The State contends that non-standard status terminates whenever a class—like probation officer—fails to fulfill any of the three criteria of Section 1.

When certain state probation officers filed suit in this court on December 18, 1992, seeking overtime under the FLSA, *Mills v. Maine*, 839 F.Supp. 3 (D.Me.1993), the State's lawyer attempted to discuss settling the case with a side agreement, but the Union's lawyer refused. On December 21, 1993, *Mills* held that probation officers were not exempt from FLSA coverage. *Id.* at 4–5. On January 3, 1994, Nancy Kenniston, Director of the Bureau of Human Resources, issued a memorandum notifying probation officers that, given the *Mills* ruling, they no longer qualified as non-standard under Article 10.C. and that the sixteen percent salary differential would be terminated before February 6, 1994.

At a meeting between the State and the Union on January 27, 1994, the Union provided the State with a proposed side agreement. This side agreement was similar to side agreements the State had made with the game wardens and others in 1985 and 1986. At a subsequent meeting between the parties on February 2, 1994, Kenneth Walo, Director of the Bureau of Employee Relations, rejected the Union's side agreement.

The plaintiffs maintain that the termination of the sixteen percent salary premium and the refusal to negotiate a side agreement were each retaliatory actions prohibited by the FLSA.

## LEGAL ISSUES

### Termination of Non–Standard Pay Premium

■ To make out a prima facie case of retaliation for the State's termination of probation officers' sixteen percent premium, the plaintiffs must satisfy three elements: (1) that they engaged in protected activity, (2) that their employer took an adverse employment action against them and (3) that the employer's adverse employment action was taken because the plaintiffs engaged in protected activity. *See Ramos v. Roche Products, Inc.*, 936 F.2d 43, 47–49 (1st Cir.), *cert. denied,* 502 U.S. 941, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991).

■ Certainly the plaintiffs have shown that they engaged in protected activity in filing the *Mills* lawsuit. They have also shown an adverse employment action by the State in rescinding the sixteen percent pay premium. The only issue is whether the adverse employment action was taken because of their engaging in protected activity. Although the matter is hotly contested, I will assume for purposes of this decision that the plaintiffs have satisfied the causation requirement of the prima facie case as well. Nevertheless, for the reasons that follow I conclude that the State has shown on the summary judgment record that it would have reached the same decision and terminated probation officers' non-standard pay in any event because of a neutral reason, namely, Article 10.C. of the collective bargaining agreement. Treating this as a mixed-motives case, therefore, I conclude that the State is entitled to summary judgment on this issue because it has demonstrated that this action would have been taken regardless of any improper motives. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1794–95, 104 L.Ed.2d 268 (1989), *limited by* section 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e–5(g)(2)(B).

Article 10.C.[2] is full of circularity. Section 1 begins by providing that "[c]lassifications listed in Section 3 which meet the following criteria [exempt from FLSA; variable workweek over 40 hours; schedule determined by employee] shall be designated as non-standard ...," a statement implying that some of the classes listed in Section 3 meet the enumerated criteria and some do not.[3] Section 3, however, provides that "[t]he following classes are designated as meeting the above criteria" and then goes on to list various categories. Thus, all the classes listed in Section 3 are said to fit the criteria, despite the Section 1 provision that suggests some may not. Section 2 increases the circularity by providing that classifications "designated as non-standard" are to receive the sixteen percent pay premium "except that any position that is found by the Bureau of Human Resources not to be exempt from the Fair Labor Standards Act for overtime compensation purposes shall not be designated non-standard." Is this a tautology, since the definition of Section 1 already includes the

---

2. Article 10.C. of the 1993–1995 collective bargaining agreement governs this dispute. In late January and early February of 1994 when the defendants removed probation officers' non-standard pay, the 1993–1995 agreement was still in effect. In any event, Article 10.C. has not changed since the FLSA exemption provisions were added to the 1986–1987 agreement, except for replacing the term "Department of Personnel" with "Bureau of Human Resources."

3. To be sure, if a comma followed "Section 3," a proper grammarian could argue that the clause beginning "which ...." is nonrestrictive and simply descriptive of Section 3. Article 10.C., however, is anything but the product of a strict grammarian.

FLSA exemption requirement and Section 3 already lists the classes that meet the criteria?

The probation officers try to make sense of these varying provisions by arguing that Section 3 is a listing of the classifications that met the criteria as of the signing of the collective bargaining agreement, and that they as probations officers qualify for the pay premium until the termination of the agreement, notwithstanding any interim determination by a court or the Bureau of Human Resources that a particular class no longer qualifies for FLSA exemption. If that were the meaning, however, it could have been achieved much more easily. All Article 10.C. needed to say was that the specified classes (listing those enumerated in Section 3) shall receive the sixteen percent pay premium until the expiration of the agreement notwithstanding any interim decision by a court or the Bureau of Human Resources that they no longer are exempt from the FLSA. As it is, the probation officers' interpretation reads much of Sections 1 and 2 out of the collective bargaining agreement.

The only reasonable reading that makes use of all the provisions of Article 10.C. yields the following interpretation: Section 1, referring to "[c]lassifications listed in Section 3 which meet the following criteria," recognizes that Section 3 establishes a ceiling on the categories to be considered for the pay premium under the negotiations, but that those categories qualify for the premium only if they continue to meet the criteria listed in Section 1, including that they be exempt from FLSA overtime compensation. Section 2 then provides for the sixteen percent premium but reiterates in typical bureaucratic fashion that it will not be provided to any classification not exempt from FLSA overtime. Admittedly, the interpretation is not free of syntax problems, for Section 3 states bluntly that the listed classes "are designated as meeting the . . . criteria." The bargaining history, however, is consistent with this interpretation, for it is uncontested that the Union tried to get an explicit provision guaranteeing the sixteen percent premium for the life of the contract but failed. Instead, the State's proposed changes to Article 10.C.

were adopted virtually intact, requiring that the classifications of Section 3 be determined exempt from the FLSA overtime provisions in order to qualify for non-standard status.

I conclude, therefore, that under Article 10.C., the sixteen percent pay premium was no longer available once a determination was made that a classification like probation officer was not exempt from the FLSA overtime provisions. That being the case, the State's and its supervisors' decision to remove the premium cannot be considered illegal retaliation; whether or not retaliation played a role in the decision, the State has demonstrated that it had to reach the same result in any event, in order to fulfill its obligation to apply the collective bargaining agreement provisions as drafted. I find it unnecessary, therefore, to explore the motivations of individual members of management following *Mills*.

The plaintiffs argue that Article 10.C., interpreted in this fashion, amounts to an illegal and unenforceable waiver of their FLSA rights. But if it was designed to achieve a waiver, it did not succeed; the *Mills* plaintiffs did *not* waive their rights, but successfully brought suit to obtain FLSA coverage now and in the future and obtained an overtime award of damages calculated on past wages that includes the sixteen percent premium. *Mills v. Maine*, 853 F.Supp. 551, 553–54 (D.Me.1994).

The only question, therefore, is whether illegal retaliation has occurred in the elimination of the sixteen percent pay premium for the future. I have already explained why the collective bargaining agreement defeats the plaintiffs' claim of post–*Mills* illegal retaliation by the State. The plaintiffs suggest alternatively that Article 10.C. was not neutral, but *advance* retaliation—and thus that even though the collective bargaining agreement may have prompted the State's actions after *Mills*, Article 10.C.'s very existence (as of the 1986–1987 collective bargaining agreement) was retaliatory in advance. The only way Article 10.C. is "retaliatory" in this sense, however, is in granting the benefit of a sixteen percent pay premium to non-standard employees solely as long as the class does not qualify for FLSA overtime.

The argument (not fleshed out by the plaintiffs) must proceed as follows: once a category of employees is determined to be exempt from FLSA overtime, an employer is effectively prohibited from voluntarily granting them any pay premium for the overtime they put in—for, if it grants such a premium and the employees are later determined to be *not* exempt, the employer must then pay not just time-and-a-half overtime on standard wages like other employees, but time-and-a-half on the premium as well. Under this approach, a protective provision that the premium will last only so long as the FLSA exemption lasts becomes "retaliatory" because it disappears when the FLSA benefits kick in. To turn such a negotiated temporary premium—for those who initially do not qualify for FLSA overtime—into "retaliation" is a perverse use of the term, not reflected in the statutory language. Article 10.C., I conclude, is not prohibited by the FLSA.[4]

### Refusal to Negotiate a Side Agreement

■ The plaintiffs have not made out a prima facie case of retaliation for the State's refusal to negotiate a side agreement with probation officers because, although the plaintiffs engaged in protected activity in filing the *Mills* lawsuit, the defendants' refusal to negotiate a side agreement was not an adverse employment action.

■ Refusal to negotiate a side agreement, like a failure to promote,[5] does not take something away from a plaintiff, but may deprive her of something she would otherwise receive. Such a deprivation could constitute adverse employment action. For the deprivation to be adverse, however, the plaintiffs must show that their expectation that they were entitled to a side agreement was reasonable. To do so in this case, they must show that the circumstances surrounding adoption of the previous side agreements—which allegedly gave rise to their expectations—were similar. That is simply not the case on this record. After the State's adoption of side agreements with the game wardens and others in 1985 and 1986, a significant change occurred: the State and the Union bargained and amended Article 10.C. to include provisions specifically regarding the consequences of FLSA eligibility.[6] As a result, side agreements were no longer necessary. As I concluded in the preceding section, the effect of the new provisions is that once a classification listed in Section 3 fails to fulfill any of the criteria of Section 1, it no longer qualifies as non-standard. Therefore, once this court in *Mills* found probation officers eligible for FLSA overtime compensation, they no longer qualified as non-standard under Article 10.C.

Because the negotiated terms of Article 10.C. dictated this result, the plaintiffs could have no reasonable expectation of a new side agreement that altered Article 10.C.'s terms. Article 12, the zipper clause of the 1993–1995 collective bargaining agreement, removed the need to renegotiate Article 10.C.'s terms. In light of the changed terms of the collective bargaining agreement, there was no longer any basis for the expectation of a side agreement. Accordingly, the defendants' refusal to negotiate the change cannot be adverse employment action.

In light of these conclusions, it is unnecessary to address other issues raised by the parties.

Summary judgment shall be entered for the defendants and against the plaintiffs.

SO ORDERED.

---

**4.** The plaintiffs gain nothing by their argument that state law renders impermissible the defendants' interpretation of the collective bargaining agreement or that state law is preempted. These arguments, in turn, depend upon what the FLSA permits or requires, the issue I have decided here.

**5.** *See Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 32 (1st Cir.1990) (finding failure to promote an adverse employment action cognizable under Title VII).

**6.** In contrast, when the State found the game wardens and others eligible for FLSA overtime compensation following the Supreme Court's *Garcia* decision in 1985, Article 10.C. did not speak to the effects of FLSA eligibility on non-standard status. The parties negotiated side agreements to account for this void.