February 14, 1996 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1777

DANA BLACKIE, ET AL.,

Plaintiffs, Appellants,

v.

STATE OF MAINE, ET AL.,

Defendants, Appellees.



ERRATA SHEET ERRATA SHEET

The opinion of this court issued on January 30, 1996, is
corrected as follows:

On page 3, line 5, change "them" to "the holders of those
positions."

On page 18, line 15, change "some level" to "some degree"

UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1777

DANA BLACKIE, ET AL.,

Plaintiffs, Appellants,

v.

STATE OF MAINE, ET AL.,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge] 



Before

Selya, Circuit Judge, 

Bownes, Senior Circuit Judge, 

and Stahl, Circuit Judge. 



John R. Lemieux for appellants. 
Peter J. Brann, Assistant Attorney General, with whom Andrew 
Ketterer, Attorney General, and Thomas D. Warren, Assistant 
Attorney General, were on brief, for appellees.





SELYA, Circuit Judge. In this appeal, several SELYA, Circuit Judge. 

probation officers employed by the State of Maine seek to evade

the consequences of what they belatedly deem to be a Faustian

bargain. The district court thought the probation officers'

claim took too much license, and rejected it. See Blackie v. 

Maine, 888 F. Supp. 203 (D. Me. 1995). The plaintiffs appeal.1 

We affirm.

I. BACKGROUND I. BACKGROUND

The subsidiary facts are not in serious dispute.

Beginning in 1978, collective bargaining agreements between the

State of Maine and certain state workers stipulated that those

employees whose positions demanded that they work non-standard

hours, i.e., irregular schedules exceeding forty hours per week,

instead of, say, regular 9:00-to-5:00 shifts, would receive a

sixteen percent premium over and above their base pay (but no

overtime compensation). Probation officers' jobs satisfied this

definition and therefore carried an entitlement to the pay

premium.

In 1985, the United States Supreme Court handed down a

resipiscent decision in which it confessed error, reversed prior

precedent, and held that the wage and hour provisions of the Fair

Labor Standards Act (FLSA), 29 U.S.C. 201-219, applied to state

 

1The plaintiffs, appellants here, occupy positions that are
variously classified as "Probation Parole Officer/Juvenile
Caseworker" and "Probation Parole Officer II." Because the
distinction between these positions makes no difference for
present purposes, we refer to the plaintiffs simply as "probation
officers."

3

employers. See Garcia v. San Antonio Metro. Transit Auth., 469 

U.S. 528, 555-57 (1985). Maine promptly evaluated its work force

to determine which state jobs came under the FLSA's overtime

compensation provisions and which did not. After concluding that

many positions within the law enforcement services bargaining

unit of the Maine State Employees Association (the Union) were

FLSA-covered, the State negotiated side agreements with the

holders of those positions. In general, these pacts eased the

transition by confirming the affected workers' eligibility for

overtime compensation, increasing their base salaries by an

average of four percent, and eliminating the sixteen percent non-

standard pay premium. The State concluded, however, that the

probation officers fell within an FLSA exemption for professional

employees, see 29 U.S.C. 213(a)(1), and therefore permitted 

them to retain their wonted status. Consequently, probation

officers continued to receive the pay premium (but no overtime

compensation).

In negotiations leading to the adoption of a collective

bargaining agreement (CBA) to take effect in 1986, the State and

the Union locked horns over the interplay between FLSA-mandated

overtime compensation and the non-standard pay premium. The

probation officers set out to secure guaranteed payment of the

premium for the life of the contract, regardless of their status

under the FLSA. The State balked. Eventually, the parties

resolved the impasse by agreeing to the non-standard workweek

article reprinted in the appendix.

4

Several years passed. Then, on December 18, 1992, a

cadre of probation officers sued the State seeking the shelter of

the FLSA. One year and three days later, the district court

vindicated the probation officers' right to receive time-and-one-

half overtime compensation under the federal law. See Mills v. 

Maine, 839 F. Supp. 3, 4-5 (D. Me. 1993). The State eschewed an 

appeal. Instead, on January 3, 1994, Nancy Kenniston, the

director of Maine's Bureau of Human Resources (BHR), notified all

probation officers (including those who had not participated in

the Mills litigation) that they would no longer receive the pay 

premium. The State reasoned that, under the terms of the non-

standard workweek article, job classifications had to meet three

enumerated criteria to qualify for non-standard status; the lack

of FLSA coverage constituted one such criterion; Mills 

established juridically that the probation officers did not

fulfill this criterion, i.e., they did not occupy "[p]ositions in

a classification . . . exempt for overtime compensation from the

FLSA"; and, having lost their non-standard status, the probation

officers had also lost their entitlement to the pay premium.

The Union countered this reclassification by proposing

a side agreement similar to those entered into between the State

and certain other bargaining units nearly a decade earlier. On

February 2, 1994, Kenneth Walo, director of Maine's Bureau of

Employee Relations, rejected this overture because the CBA

expressly addressed the linkage between FLSA coverage status and

the non-standard pay premium a circumstance that did not obtain

5

when the State negotiated the earlier pacts and because the

CBA's "zipper clause" made it pellucid that the parties had no

obligation to renegotiate matters so addressed.2 Stymied by

this turn of events, several probation officers sued a phalanx of

defendants (collectively, the State) under the FLSA's anti-

retaliation provision.3 They charged, inter alia, that the 

State's decision to eliminate the pay premium while at the same

time abjuring a side agreement constituted acts of reprisal

provoked by the probation officers' successful crusade for FLSA

overtime pay. The State denied the allegations.

After the parties cross-moved for summary judgment, the

district court granted the State's motion. As to the lost pay

premium, the court concluded that the bargained language of the

 

2The zipper clause states:

Each party agrees that it shall not
attempt to compel negotiations during the
term of this agreement on matters that could
have been raised during the negotiations that
preceded this agreement, matters that were
raised during the negotiations that preceded
this agreement, or matters that are
specifically addressed in this agreement.

Maine's Supreme Judicial Court has given such clauses full force
and effect. See, e.g., Bureau of Employee Relations v. AFSCME, 
614 A.2d 74, 77 (Me. 1992).

3The statute provides in part that no employer may

discharge or in any other manner discriminate
against any employee because such employee
has filed any complaint or instituted or
caused to be instituted any proceeding under
or related to [the FLSA].

29 U.S.C. 215(a)(3).

6

CBA, as opposed to any retaliatory animus, compelled the result.

See Blackie, 888 F. Supp. at 207. As to the State's spurning of 

a side agreement, the court held that this rebuff did not

constitute an adverse employment action under the FLSA. See id. 

at 208. This appeal ensued.

II. ANALYSIS II. ANALYSIS

The district court's closely reasoned opinion mortally

wounds the arguments that the appellants parade before us. Thus,

we affirm the judgment largely for the reasons already

articulated, adding only the finishing touches.

First: The appellants labor to convince us that the First: 

parties' disagreement over the meaning of the non-standard

workweek article forestalls the entry of summary judgment. Their

labors are both unproductive and unpersuasive.

Of course, summary judgment is appropriate only if the

record reveals no genuine issue of material fact and the movant

demonstrates an entitlement to judgment as a matter of law. See 

Fed. R. Civ. P. 56(c); see also McCarthy v. Northwest Airlines, 

Inc., 56 F.3d 313, 315 (1st Cir. 1995) (collecting cases); 

National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 

(1st Cir.), cert. denied, 115 S. Ct. 2247 (1995). Under this 

standard, "a party seeking summary judgment [must] make a

preliminary showing that no genuine issue of material fact

exists. Once the movant has made this showing, the nonmovant

must contradict the showing by pointing to specific facts

demonstrating that there is, indeed, a trialworthy issue."

7

National Amusements, 43 F.3d at 735. Nonetheless, genuineness 

and materiality are not infinitely elastic euphemisms that may be

stretched to fit whatever pererrations catch a litigant's fancy.

In the lexicon of Rule 56, "genuine" connotes that the

evidence on the point is such that a reasonable jury, drawing

favorable inferences, could resolve the fact in the manner urged

by the nonmoving party, and "material" connotes that a contested

fact has the potential to alter the outcome of the suit under the

governing law if the controversy over it is resolved

satisfactorily to the nonmovant. See United States v. One Parcel 

of Real Property (Great Harbor Neck, New Shoreham, R.I.), 960 

F.2d 200, 204 (1st Cir. 1992). The happenstance that both

parties move simultaneously for brevis disposition does not, in 

and of itself, relax the taut line of inquiry that Rule 56

imposes. "Barring special circumstances, the nisi prius court

must consider each motion separately, drawing inferences against

each movant in turn." EEOC v. Steamship Clerks Union, Local 

1066, 48 F.3d 594, 603 n.8 (1st Cir.), cert. denied, 116 S. Ct. 

65 (1995). Matters of law, however, are for the court to

resolve. See Stauble v. Warrob, Inc., 977 F.2d 690, 693 (1st 

Cir. 1992).

In this instance, the appellants confuse matters of

fact with matters of law. It is for the court, not the jury, to

ascertain whether the terms of an integrated agreement are

unambiguous, and if so, how to construe those terms. See Allen 

v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992). "In this 

8

sense, questions about the meaning of contractual provisions are

questions of law, and we review the district court's answers to

them de novo." United States Liab. Ins. Co. v. Selman, 70 F.3d 

684, 687 (1st Cir. 1995).

The appellants try to bypass these familiar rules by

portraying the non-standard workweek article as freighted with

ambiguity. But a contract is not ambiguous merely because a

party to it, often with a rearward glance colored by self-

interest, disputes an interpretation that is logically compelled.

See FDIC v. Singh, 977 F.2d 18, 22 (1st Cir. 1992). Nor must a 

contract "negate every possible construction of its terms in

order to be unambiguous." Triple-A Baseball Club Assocs. v. 

Northeastern Baseball, Inc., 832 F.2d 214, 220 (1st Cir. 1987) 

(quoting Waxler v. Waxler, 458 A.2d 1219, 1224 (Me. 1983)), cert. 

denied, 485 U.S. 935 (1988). Rather, a contract is ambiguous 

only when its terms lend themselves to more than one reasonable 

interpretation. See Fashion House, Inc. v. K Mart Corp., 892 

F.2d 1076, 1083 (1st Cir. 1989); RCI Northeast Servs. Div. v. 

Boston Edison Co., 822 F.2d 199, 202 (1st Cir. 1987); American 

Policyholders' Ins. Co. v. Kyes, 483 A.2d 337, 340 (Me. 1984). 

The specific provision at issue here the non-standard

workweek article most assuredly is not a model of syntax;

indeed, it appears to create a tautology in defining which

classes of employees qualify for the non-standard pay premium.

Yet the circle formed by the contract language is virtuous rather

than vicious, and does not render the text ambiguous. Read as a

9

whole, the article can sustain only one reasonable

interpretation. Section 1 provides that the employee

classifications listed in section 3 (e.g., probation officers)

must meet each of three criteria (exemption from FLSA coverage,

elongated workweek, irregular work schedule) to qualify as non-

standard positions. Section 2 merely makes explicit what is

implicit in a combined reading of the other two sections: the

State's power to delete an employment category from non-standard

status once it appropriately determines that the employees within

that category are not exempt from the FLSA. The short of it is

that, under the terms of the article, FLSA coverage and non-

standard status are mutually exclusive. Accordingly, the FLSA

overtime matrix and the non-standard pay premium are mutually

exclusive methods of remuneration.

The appellants challenge this seemingly straightforward

construction by training their sights single-mindedly on section

3. Doing enormous violence to context, they suggest that because

certain job classifications enumerated in section 3 are

designated therein as "meeting the above criteria," those jobs

are frozen into place (and, thus, entitled to receive the pay

premium) for the duration of the CBA. This infrigidated reading

melts under the most mild scrutiny.

It is hornbook law that an interpretation which gives

effect to all the terms of a contract is preferable to one that

harps on isolated provisions, heedless of context. See Smart v. 

Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st 

10

Cir. 1995); Fashion House, 892 F.2d at 1084; Salmon Lake Seed Co. 

v. Frontier Trust Co., 153 A. 671, 672 (Me. 1931). Since the 

whole of an integrated agreement ordinarily should be considered

in order to determine the meaning of any individual part, the

appellants' Cyclopic reading of section 3 a reading that not

only ignores but also flatly contradicts sections 1 and 2 

cannot be countenanced. If the parties intended to guarantee the

probation officers a pay premium for the life of the CBA,

sections 1 and 2 would be totally superfluous (and, indeed, at

cross-purposes).

To sum up, the district court appropriately treated the

non-standard workweek article as unambiguous, gave its terms

their plain and ordinary meaning, and did not err in interpreting

it favorably to the State at the summary judgment stage.

Second: The appellants trumpet that summary judgment Second: 

should have entered in their favor because the State admittedly

eliminated the probation officers' pay premium in response to the

Mills lawsuit. Because this ipse dixit relies upon a contorted 

view of the law, we reject it.

A A

The FLSA's anti-retaliation provision prohibits an

employer from penalizing an employee who seeks to enforce rights

guaranteed by the federal law. See 29 U.S.C. 215(a)(3). 

Although the framework for proving that an employer took an eye

for an eye can vary depending upon the evidence available to show

retaliatory animus, cf. Fields v. Clark Univ., 966 F.2d 49, 51-52 

11

(1st Cir. 1992) (elucidating this point in the Title VII

environment), cert. denied, 113 S. Ct. 976 (1993), the elements 

of a retaliation claim remain much the same. They comprise, at a

minimum, a showing that (1) the plaintiff engaged in statutorily

protected activity, and (2) his employer thereafter subjected him

to an adverse employment action (3) as a reprisal for having

engaged in the protected activity. See Mesnick v. General Elec. 

Co., 950 F.2d 816, 827 (1st Cir. 1991), cert. denied, 504 U.S. 

985 (1992); York v. City of Wichita Falls, 944 F.2d 236, 239-41 

(5th Cir. 1991) (York I); Connell v. Bank of Boston, 924 F.2d 

1169, 1179 (1st Cir.), cert. denied, 501 U.S. 1218 (1991); 

Petitti v. New Eng. Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir. 

1990). The third element is of pivotal importance in this case.

Under it, a plaintiff must proffer evidence from which a

reasonable factfinder could infer that the employer retaliated

against him for engaging in the protected activity. See Mesnick, 

950 F.2d at 828. In other words, the record must enable the

trier plausibly to find that "a causal connection existed between 

the protected conduct and the adverse action." Id. at 827 

(emphasis supplied) (citing Connell, 924 F.2d at 1179). 

The appellants easily demonstrated the first two

elements of their prima facie case; it is uncontested that they

engaged in a protected activity (filing suit under the FLSA) and

that the State subsequently took an adverse employment action

(eliminating the non-standard pay premium). On the third element

the appellants made a much more tenuous showing: they limned a

12

close temporal link the change in classification followed hot

on the heels of the Mills decision and produced evidence of 

statements by certain officials to the effect that the district

court's order in Mills led to the State's decision to reclassify 

the probation officers and revoke their pay premium.4 As we

elucidate below, this evidence, taken most hospitably to the

appellants, fails to create a genuine question of material fact

in respect to the third element of their cause of action.

B B

The fundamental flaw in the appellants' argument is

that it depends on applying a black-letter legal rule in a purely

mechanical fashion, divorced from considerations of policy and

logic. They begin, auspiciously enough, with the proposition

that the FLSA prohibits an employer from taking an adverse

employment action because an employee participates in a protected

activity. They then observe that the State scrapped the pay

premium because of the Mills lawsuit. On this basis, they assert 

that the State violated the FLSA. This is a non sequitur: one

plus one does not equal three.

The appellants' argument assumes that the FLSA's ban on

retaliating against an employee who engages in a protected

activity is the functional equivalent of a straightjacket which
 

4The State contends that these statements are immaterial
because none of them was attributable to the actual decisionmaker
(Kenniston). See, e.g., Medina-Munoz v. R.J. Reynolds Tobacco 
Co., 896 F.2d 5, 10 (1st Cir. 1990). We need not pursue this 
point because even if the statements are probative of the matter
asserted an issue on which we express no opinion they are
insufficient to turn the tide.

13

restrains an employer from responding on the basis of its

business judgment to the outcome brought about by the protected 

activity. We disagree with this assumption. The FLSA like

other anti-retaliation laws does not immobilize employers in

this manner. An employer may reorganize its affairs and take

other necessary employment actions in order to manage the impact

of compliance with the outcomes produced by a protected activity

so long as it does so for legitimate reasons and not in reprisal

for the fact of an employee's participation. See, e.g., York v. 

City of Wichita Falls, 48 F.3d 919, 920-21 (5th Cir. 1995) (York 

II) (finding no retaliation under the FLSA when city restructured 

compensation arrangements "to comply with Garcia and the FLSA 

within existing budgetary constraints"); Adams v. City of 

McMinnville, 890 F.2d 836, 839 (6th Cir. 1989) (similar). A 

contrary rule would mummify the status quo and prevent an

employer from complying with a court order in the manner that it

deems most compatible with the lawful operation of its business.

Nothing in the FLSA even remotely suggests this grotesque result.

Recognizing this abecedarian principle leads to the

following conclusion. The anti-retaliation provision mandates

that an employer must put to one side an employee's lawful

efforts to secure rights assured by the FLSA. At the same time,

the statute does not foreclose the employer from exercising its

business judgment simply because doing so may affect an employee

who successfully asserted FLSA-protected rights.

The other side of the coin, of course, is that by

14

engaging in a protected activity an employee does not acquire

immunity from the same risks that confront virtually every

employee every day in every work place. The FLSA is neither a

shield against legitimate employer actions nor a statutory

guaranty of undiluted compensation, come what may. This case

aptly illustrates the point: applying the anti-retaliation

provision as the appellants ask would bar the employer from

enforcing a valid preagreed contractual provision specifically

negotiated to guard against the very eventuality a change in

the parties' status that the appellants subsequently labored to

achieve. That is not the law.

C C

The appellants' thesis suffers from another infirmity

as well. The thesis necessarily depends on the existence of some

evidence that the statutorily protected activity (i.e., the

appellants' instigation of, and participation in the Mills 

litigation) furnished the motive driving the State's execution of

the adverse employment action (i.e., the shift in

classification). We agree with the lower court that the record

contains no such evidence.

The CBA provides in substance that probation officers

will receive the non-standard pay premium as long as they remain,

among other things, exempt from coverage under the FLSA's

overtime pay provisions. Once Mills established that the 

probation officers were not so exempt, the CBA dictated that the

15

non-standard pay premium be eliminated.5 The State's decision

to abolish the pay premium applied equally to all probation

officers, regardless of whether they had joined the Mills 

plaintiffs. What is more, that decision was taken in response

to the Mills ruling only in the sense that the State believed 

itself obligated to follow both the letter and the spirit of the

federal court's decree. There is simply no basis for a reasoned

inference that the State's reliance on the CBA was a pretext for

retaliation.

In a nutshell, then, the State plainly changed the

appellants' classification for a nondiscriminatory reason,

namely, to implement the terms of a contract that required the

State to eliminate the pay premiums to match the recipients'

status vis-a-vis the FLSA. That the State's action took place

because of a judicial declaration of the appellants' status,

brought about by the appellants' suit, neither transforms the

character of the action nor renders it per se unlawful under the

FLSA. For aught that appears, the State would have taken the

same action regardless of the presence or absence of retaliatory

animus.

 

5The appellants argue that the letter of the CBA did not
require the BHR to reclassify their positions merely because the
federal district court had so ruled. This amounts to little more
than whistling past the graveyard. Once the federal court had
spoken, state officials were duty bound to enforce the State's
rights under the terms of the CBA in order to protect the public
fisc especially where, as here, the CBA expressly addressed the
situation. And, moreover, the appellants had no possible reason
to anticipate that the State would refrain from exercising its
explicitly reserved rights under the CBA.

16

Third: Next, the appellants bombard the CBA itself. Third: 

They have lately come to the view that a contract which permits

the State to forgo the non-standard pay premium whenever a court

determines that a class of employees is not exempt from FLSA

coverage is an abomination, and thus unenforceable.

This barrage is fired from two different directions.

Both volleys land well wide of the mark.

A A

The appellants asseverate that if the terms of the CBA

ensure that a successful FLSA suit inevitably will result in

ending the pay premium, then the CBA contains a veiled threat

against pursuing FLSA rights and is per se retaliatory. The

asseveration lacks force.

The CBA leaves no room to doubt that the State bestowed

the non-standard pay premium on the probation officers in lieu of

overtime compensation.6 It simply is not retaliatory for an

employer and an employee to agree to alternative methods for

compensating overtime work based on the latter's coverage status

 

6Based on actions taken by the Mills court, the appellants 
contend that the sixteen percent pay premium comprised part of
their base wage rate. This contention is disingenuous. While
the Mills court included the pay premium in the probation 
officers' "regular rate of pay," see Mills v. Maine, 853 F. Supp. 
551, 554 (D. Me. 1994), it did so solely as part of calculating
the probation officers' damages under the FLSA. That damage
computation has no bearing on the contractual question of whether
the parties intended the premium to be a surrogate for overtime
compensation.

17

under the FLSA.7 See, e.g., Walling v. Belo Corp., 316 U.S. 

624, 630 (1941) (holding that "nothing in the [FLSA] bars an

employer from contracting with his employees to pay them the same

wages that they received previously"); Anderson v. Bristol, 6 

F.3d 1168, 1173 (6th Cir. 1993) (holding that the FLSA "does not

prohibit changes in wage rates; it prohibits the payment of

overtime at less than one and one-half times the regular wage

rate"); Adams, 890 F.2d at 839 (finding no retaliation when city 

altered employees' compensation structure to offset budgetary

impact of Garcia decision). 

B B

The appellants also claim that the either-or

proposition contained in the non-standard workweek article

amounts to an unenforceable waiver of their FLSA rights. See 

Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 

745-46 (1981) (holding that employees may not contract away their

FLSA rights). This is an old whine in a new bottle. As Judge

Hornby observed, see Blackie, 888 F. Supp. at 207, the appellants 

enjoyed the full panoply of rights secured to them by the FLSA.
 

7The appellants bewail the fact that their take-home pay may
decrease under the new format. This herring is very red. If
there is a decrease, the record contains nothing to suggest that
it will be brought about by anything other than the State's
efforts to contain overtime. Though the FLSA requires an
employer to pay a covered employee time-and-one-half for overtime
work, the employee has no vested entitlement to such work. See 
Adams, 890 F.2d at 840; see also Joint Explanatory Statement of 
the Committee of the Conference, H.R. Conf. Rep. No. 357, 99th
Cong., 1st Sess. 8 (1985), reprinted in 1985 U.S.C.C.A.N. 651, 
670. In any event, the pivotal issue here is not the degree of
the appellants' alleged harm, but whether the State retaliated
against them at all.

18

Indeed, they successfully prosecuted their action and, as a

consequence, stand to recover substantial damages.8

Fourth: Shifting gears, the appellants posit that the Fourth: 

State's refusal to negotiate a side agreement with them

comparable to the pacts entered into between the State and other

law enforcement bargaining units in the wake of Garcia 

constitutes an unlawful reprisal under the FLSA. We think not.

In a retaliation case, as in virtually any other

employment discrimination case premised on disparate treatment,

it is essential for the plaintiff to show that the employer took

a materially adverse employment action against him. See, e.g., 

York I, 944 F.2d at 239-41; Spring v. Sheboygan Area Sch. Dist., 

865 F.2d 883, 885 (7th Cir. 1989). Determining whether an action

is materially adverse necessarily requires a case-by-case

inquiry. See Welsh v. Derwinski, 14 F.3d 85, 86 (1st Cir. 1994); 

see also 2 Lex K. Larson, Employment Discrimination 34.04 (2d 

ed. 1994). Moreover, the inquiry must be cast in objective

terms. Work places are rarely idyllic retreats, and the mere

fact that an employee is displeased by an employer's act or

omission does not elevate that act or omission to the level of a

materially adverse employment action.

Withal, some degree of generalization can be attempted.

Typically, the employer must either (1) take something of
 

8The appellants attempt to blunt this thrust by arguing that
the State will use the savings from its elimination of the non-
standard pay premium to fund the damage award. This is beside
the point. How the State chooses to spend any savings it
realizes from eliminating the premium is the State's business.

19

consequence from the employee, say, by discharging or demoting

her, reducing her salary, or divesting her of significant

responsibilities, see Crady v. Liberty Nat. Bank & Trust Co., 993 

F.2d 132, 136 (7th Cir. 1993); Connell, 924 F.2d at 1179, or (2) 

withhold from the employee an accouterment of the employment

relationship, say, by failing to follow a customary practice of

considering her for promotion after a particular period of

service, see, e.g., Hishon v. King & Spalding, 467 U.S. 69, 75-76 

(1984). Thus, the first employment action of which the

appellants complain altering the probation officers' status in

a way that rendered them ineligible for the preexisting sixteen

percent pay premium constituted a materially adverse taking

(albeit not an actionable one because it was not retaliatory in

nature). But the second employment action to which the

appellants advert the State's unwillingness, in the aftermath

of Mills, to negotiate a side agreement with them does not rise 

to the level of a materially adverse action. We explain briefly.

The appellants hinge their claim on the notion that

past practice created an expectation that, when the FLSA became

applicable to a particular position, the State would negotiate a

side agreement. By refusing to follow this practice, the thesis

runs, the State deprived the appellants of their expectancy. We

agree that under certain circumstances an employer's inaction can

operate to deprive an employee of a privilege of employment that

an employee had reason to anticipate he would receive; in those

situations, the deprivation constitutes an adverse employment

20

action. See, e.g., Hishon, 467 U.S. at 75-76; Petitti, 909 F.2d 

at 32. But trying to fit this case within the contours of that

doctrine is like trying to fit a square peg snugly into a round

hole.

Here, the presence of the non-standard workweek article

accomplished two things: (1) it relieved the State of any

obligation to dicker in the event of a change in the probation

officers' FLSA status; and (2) it effectively dashed any

realistic expectation that the State would negotiate a side

agreement in the event of a change in FLSA status (especially

since the CBA's zipper clause, see supra note 2, specifically 

relieves both parties of any duty to renegotiate contract

provisions in midstream). Accordingly, the appellants' professed

expectancy is only wishful thinking.

If this were not enough, the historical parallel that

the appellants draw is not a parallel at all. It conveniently

ignores the fact that, when the State negotiated side agreements

nearly a decade earlier, the CBA then in effect did not address

the interplay of FLSA overtime and the non-standard pay premium.

By contrast, the contemporaneous CBA expressly defines this

relationship and indicates the results that will flow from a

change in status. To put it plainly, the circumstances had

changed so dramatically that the appellants step into quicksand

once they march under the banner of past practice.

To say more would be to knight a monarch. On the facts

of this case, the State's decision to abjure a side agreement did

21

not constitute an adverse employment action. It follows

inexorably, as night follows day, that the appellants have failed

to validate this aspect of their claim.9

III. CONCLUSION III. CONCLUSION

We need go no further. Having agreed to the

elimination of their pay premium if found to be eligible for FLSA

overtime compensation, the appellants have no right to complain

that, when they pressed, the State held them to their bargain.

Affirmed. Affirmed. 

 

9We have remarked, time and again, that irony is no stranger
to the law. See, e.g., United States v. LaBonte, 70 F.3d 1396, 
1401 n.1 (1st Cir. 1995); Amanullah v. Nelson, 811 F.2d 1, 18 
(1st Cir. 1987). This case provides yet another example. When
the Mills plaintiffs first sued, the State offered to discuss a 
settlement predicated on a side agreement, but the Union's lawyer
(now counsel for the plaintiffs in this case) turned a deaf ear.

22

APPENDIX APPENDIX

[Note: This provision is excerpted from the 1986-87 CBA. The
parties represent that all subsequent iterations of the CBA
(including the 1993-95 version, which was in force when the
current controversy developed) contain substantially identical
language.]

C. Non-Standard Workweek

1. Classifications listed in Section 3 which meet
the following criteria shall be designated as non-
standard:

(a) Positions in a classification have been
determined by the [BHR] to be exempt for overtime
compensation from the [FLSA];

(b) Employees are required by working conditions
to work a variable workweek in excess of forty
(40) hours; and

(c) Employees' workweek are [sic] irregular and
work hours cannot be scheduled or determined
except by the employee.

2. Employees in a classification which is
designated as non-standard shall be compensated at
a rate of sixteen percent (16%) above the basic
rates in their salary grades, except that any
position that is found by the [BHR] not to be
exempt from the Fair Labor Standards Act for
overtime compensation purposes shall not be
designated non-standard.

3. The following classes are designated as
meeting the above criteria:

Forest Ranger IV
Game Warden Pilot
Marine Patrol Pilot
Probation Parole Officer/Juvenile Caseworker
Probation Parole Officer II
Special Agent Investigator
Special Investigator

State of Maine-Maine State Employees Association Agreement, Law
Enforcement Services, Art. 10.C. at 13-14 (1986-1987), reprinted 
in Blackie, 888 F. Supp. at 205. 

23