Jon MILLS, et al., Plaintiffs, Appellants,

v.

STATE of MAINE, Defendant, Appellee.

No. 96–1973.

United States Court of Appeals,
First Circuit.

Heard Feb. 5, 1997.

Decided July 7, 1997.

38

John R. Lemieux, Readfield, ME, for appellants.

Peter J. Brann, Assistant Attorney General, with whom Andrew Ketterer, Attorney General, and Thomas D. Warren, Assistant Attorney General, Augusta, ME, were on brief for appellee.

Before STAHL, Circuit Judge, BOWNES, Senior Circuit Judge, and LYNCH, Circuit Judge.

STAHL, Circuit Judge.

This case requires us to determine whether the Eleventh Amendment, as recently interpreted by the Supreme Court in *Seminole Tribe v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), bars a federal suit for overtime pay under the Fair Labor Standards Act ("FLSA") brought by state employees against the State of Maine. The district court concluded that *Seminole Tribe* was a bar and dismissed the suit. For the reasons that follow, we affirm that ruling and thus find unconstitutional a grant of federal court jurisdiction contained in a provision of

29 U.S.C. § 216(b). We also deny a motion made·on· appeal by plaintiffs-appellants to amend their complaint.

### Background and Prior Proceedings

In this case, filed in federal district court in December 1992, ninety-six current and former probation and parole officers (plaintiffs-appellants) have asserted that the State of Maine improperly failed to pay them overtime in accordance with the requirements imposed by Section 7 of the FLSA, as codified at 29 U.S.C. § 207. Maine contended that the probation officers were exempt from the FLSA's overtime provisions. The district court concluded that the plaintiffs were covered employees but came within the FLSA's partial exemption for law enforcement officers, thus requiring additional proceedings on the scope of Maine's liability and the damages recoverable by the probation officers, if any. Following the district court's ruling, the state brought itself into compliance with the FLSA's wage and hour requirements, but because the litigants disputed how much overtime back pay Maine owed the probation officers, the district court submitted the plaintiffs' claims and time sheets to a special master. *See Mills v. Maine*, 853 F.Supp. 551, 552 (D.Me.1994) (ruling on "issues affecting what damages the State must pay the probation officers"); *Mills v. Maine*, 839 F.Supp. 3 (D.Me.1993) (finding liability).

The proceedings on liability and damages had not yet concluded when the Supreme Court issued its decision in *Seminole Tribe v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). *Seminole Tribe* held that Congress cannot exercise its Article I powers to abrogate the states' Eleventh Amendment immunity from suit in federal court, *see id.* at ——–——, 116 S.Ct. at 1131–32, and thus overruled *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). On the basis of the holding in *Seminole Tribe*, Maine filed a motion with the district court asking that the case be dismissed for lack of subject matter jurisdiction. The district court granted the motion and dismissed the case pursuant to Fed.R.Civ.P. 12(b)(1). *See Mills v. State*, No. 92–410–P–H, 1996 WL 400510 (D.Me.

July 3, 1996). In so doing, the district court refused the probation officers' request that the court either allow them to conduct discovery on whether Maine waived its Eleventh Amendment immunity or, alternatively, transfer the case to state court. This appeal ensued.

### Standard of Review

■ We review *de novo* a district court's dismissal for lack of subject matter jurisdiction under Rule 12(b)(1). *See Murphy ·v. United States*, 45 F.3d 520, 522 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2581, 132 L.Ed.2d 831 (1995).

### *Seminole Tribe* and Eleventh Amendment Immunity

■ To determine whether Congress has abrogated the states' Eleventh Amendment immunity from suit in federal court in enacting the FLSA amendments at issue in this case, we must examine two issues: "first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,' and second, whether Congress has acted 'pursuant to a valid exercise of power.'" *Seminole Tribe*, —— U.S. at ——, 116 S.Ct. at 1123 (internal citation omitted) (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985)).

### A. Intent to Abrogate

A centerpiece of the New Deal, Congress enacted the Fair Labor Standards Act in 1938. The constitutional validity of the Act's minimum wage, maximum hour, and record-keeping requirements, in addition to its prohibition of interstate shipment of proscribed goods, was challenged under the Commerce Clause as well as the Fifth and Tenth Amendments. A unanimous Supreme Court upheld the Act in 1941. *See United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). While the original 1938 Act specifically excluded states and their political subdivisions from its aegis, Congress amended the FLSA in 1961 and 1966 to extend coverage to some state workers employed in state schools, hospitals, and nursing homes. These amendments were challenged under the Tenth Amendment, but the Supreme

**42**

Court ruled in 1968 that the amendments were legitimate expressions of Congress' Commerce Clause powers. *See Maryland v. Wirtz,* 392 U.S. 183, 198–99, 88 S.Ct. 2017, 2024–25, 20 L.Ed.2d 1020 (1968).

In 1973, however, the Supreme Court concluded that the FLSA did not subject states to suits brought by state employees in federal court because Congress had not indicated with sufficient clarity an intent to abrogate the states' Eleventh Amendment sovereign immunity. *See Employees of the Dep't of Pub. Health & Welfare v. Department of Pub. Health & Welfare,* 411 U.S. 279, 285, 93 S.Ct. 1614, 1618, 36 L.Ed.2d 251 (1973). The Court noted that it had scrutinized the statute's text and legislative history, but "ha[d] found not a word ... to indicate a purpose of Congress to make it possible for a citizen of that State or another State to sue the State in the federal courts." *Id.*

In 1974, in the wake of the Court's decision in *Employees,* Congress amended the FLSA to cover almost all state employees and to express its intent to subject states to private suits brought in federal court. Two years later, however, in 1976, the Supreme Court overruled *Wirtz,* and held that Congress did not have the power to extend FLSA protections to state employees in "areas of traditional governmental functions." *National League of Cities v. Usery,* 426 U.S. 833, 855, 96 S.Ct. 2465, 2476, 49 L.Ed.2d 245 (1976) (5–4 decision). In 1985, however, the Supreme Court reversed itself yet again and overruled *Usery* in *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (5–4 decision). "The result of *Garcia* was to bring all employees of the states and their political subdivisions within the full coverage of the FLSA." *Gilbreath v. Cutter Biological, Inc.,* 931 F.2d 1320, 1324 (9th Cir.1991).

■ There can be little doubt that the FLSA, in its current form, makes clear Congress' intention to abrogate state immunity from suit in federal court in private FLSA actions. The Act, as amended, defines "Employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d). In relevant part, it further provides that, "In the case of an individual employed by a public agency, such term means ... any individual employed by a State, political subdivision of a State, or an interstate governmental agency." 29 U.S.C. § 203(e)(2),(C). Finally, the Act, as amended, provides in pertinent part that, "An action to recover the liability prescribed ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees." 29 U.S.C. § 216(b).

In light of this language and the history surrounding it, we agree with the other courts of appeals that have examined the FLSA's provisions and have concluded that the Act contains the necessary clear statement of congressional intent to abrogate state sovereign immunity. *See Timmer v. Michigan Dep't of Commerce,* 104 F.3d 833, 837 (6th Cir.1997); *Wilson–Jones v. Caviness,* 99 F.3d 203, 208 (6th Cir.1996), *reh'g denied and amended by* 107 F.3d 358 (6th Cir.1997); *Brinkman v. Department of Corrections,* 21 F.3d 370, 372 (10th Cir.1994); *Reich v. New York,* 3 F.3d 581, 590–91 (2d Cir.1993); *Hale v. Arizona,* 993 F.2d 1387, 1391 (9th Cir.1993) (en banc) ("Congress has made unmistakably clear its intention to apply the FLSA to the states.").

## B. Power to Abrogate

Having determined that Congress has clearly manifested its intent to abrogate state sovereign immunity from private FLSA suits in federal courts, we must next consider whether Congress in doing so "has acted 'pursuant to a valid exercise of power.'" *Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1123 (quoting *Mansour,* 474 U.S. at 68, 106 S.Ct. at 425–26).

### 1. The Recital/Declamation of Power Issue

Both sides in this dispute agree that Congress referred to its Commerce Clause powers when it enacted both the original FLSA and the subsequent amendments to the Act that are at issue in this case. *See* 29 U.S.C. § 202(b) (declaring that the FLSA is an "exercise by Congress of its power to regulate commerce among the several States and with

foreign nations."). The probation officers concede that, whatever may have been the law of the land under the holding of *Union Gas, see* 491 U.S. at 23, 109 S.Ct. at 2286, *Seminole Tribe* now precludes Congress from using its Commerce Clause powers or any of its other Article I powers to grant jurisdiction to federal courts in suits involving states that do not consent to be sued. *See* —— U.S. at —— – ——, 116 S.Ct. at 1131–32. The probation officers, however, point out that *Seminole Tribe* reaffirmed Congress' power to abrogate state immunity from suit in federal court by enacting legislation pursuant to section five of the Fourteenth Amendment, *see id.* at ——, ——, 116 S.Ct. at 1125, 1128 (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452–56, 96 S.Ct. 2666, 2669–71, 49 L.Ed.2d 614 (1976)), and contend that the FLSA amendments still subject unwilling states to suit in federal court because Congress had the power to enact those amendments under section five of the Fourteenth Amendment.

■ While Congress' invocation of its Commerce Clause powers is probative, it is not dispositive of whether it had the power to enact the FLSA amendments in question under section five of the Fourteenth Amendment. " 'Our duty in passing on the constitutionality of legislation is to determine whether Congress had the authority to adopt legislation, not whether it correctly guessed the source of that power.' " *Timmer,* 104 F.3d at 839 (quoting *Usery v. Charleston County Sch. Dist.,* 558 F.2d 1169, 1171 (4th Cir.1977)). As the Supreme Court has explained, "[t]he question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948) (*quoted in EEOC v. Wyoming,* 460 U.S. 226, 243–44 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983) *and Ramirez v. Puerto Rico Fire Serv.,* 715 F.2d 694, 698 (1st Cir.1983)). *See also* Laurence H. Tribe, *American Constitutional Law* 307 n. 6 (2d ed. 1988) ("An otherwise valid exercise of congressional authority is not, of course, invalidated if Congress happens to recite the wrong clause [of the Con-

stitution] . . . or, indeed, if Congress recites no clause at all.") (citing *Woods* ).

Specifically with respect to congressional exercises of power pursuant to section five of the Fourteenth Amendment, we have indicated that "[t]he omission of any ritualistic incantation of powers by the Congress is not determinitive, for there is no requirement that the statute incorporate buzz words such as 'Fourteenth Amendment' or 'section 5' or 'equal protection'." *Ramirez,* 715 F.2d at 698. Our Fourteenth Amendment approach is one that we have directly adopted from Supreme Court precedent. *See Wyoming,* 460 U.S. at 243–44 n. 18, 103 S.Ct. at 1064 n.18.

■ Accordingly, as we have had previous occasion to point out, "absent an outright congressional declamation, it is th[is] court's task to decipher whether Congress has enacted legislation pursuant to its section 5 powers. . . . Such an inquiry necessarily focuses upon whether or not the objectives of the legislation are within the scope of Congress' power under section 5 of the Fourteenth Amendment." *Ramirez,* 715 F.2d at 698. In undertaking this inquiry, we are mindful of the Supreme Court's cautionary admonition that "we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 16, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). This word of warning suggests that "a court should *carefully consider* the propriety and effect of concluding that Congress has acted pursuant to § 5." *Timmer,* 104 F.3d at 840.

■ In this case, the litigants do not dispute that there is no congressional statement in the FLSA or the statute's legislative history of any recourse to section five, Fourteenth Amendment powers. Indeed, the State of Maine essentially contends that because Congress invoked its Commerce Clause powers in passing the FLSA and the amendments pertinent to this dispute, the statute cannot be justified under section five of the Fourteenth Amendment or any constitutional provision other than the Commerce Clause. Even considering *Pennhurst* 's 'proceed with caution' rule, the problem with this argument

is that it is contrary to binding Supreme Court precedent and prior decisions of this circuit and is not logical. As other federal courts have explained in looking at the 1974 amendments to the FLSA, one cannot read Congress' statement regarding the Act's validity under the Commerce Clause to "indicat[e] that Congress intended to exclude other applicable constitutional bases for the Act." *Brown v. County of Santa Barbara,* 427 F.Supp. 112, 114 (C.D.Cal.1977) (citing *Usery v. Allegheny County Institution Dist.,* 544 F.2d 148, 155 (3d Cir.1976)).

Because Congress' recital of its Commerce Clause powers did not evince an intent to exclude other constitutional bases for its action, we thus must "carefully consider," *see Timmer,* 104 F.3d at 840, whether the FLSA amendments at issue in this case "are within the scope of Congress' power under section 5 of the Fourteenth Amendment." *Ramirez,* 715 F.2d at 698.[1]

### 2. The FLSA Amendments and Equal Protection

 Section five of the Fourteenth Amendment, which provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of [this Amendment]," is a congressional enforcement clause that is by no means unique. Virtually identical language is also found in the Thirteenth, Fifteenth, Eighteenth, Nineteenth, Twenty-third, Twenty-fourth, and Twenty-sixth Amendments. When determining whether congressional enactments are "appropriate" and valid exercises of enforcement clause powers such as the one at issue here, Supreme Court precedent indicates that we look to whether the act is a "rational means" to an end that is "comprehended" by the underlying constitutional amendment. *South Carolina v. Katzenbach,* 383 U.S. 301,

324, 326, 86 S.Ct. 803, 817–18, 15 L.Ed.2d 769 (1966) (upholding Voting Rights Act of 1965 under the Fifteenth Amendment's enforcement clause); *see also James Everard's Breweries v. Day,* 265 U.S. 545, 558–59, 563, 44 S.Ct. 628, 631, 633, 68 L.Ed. 1174 (1924) (upholding Supplemental Prohibition Act of 1921 under the Eighteenth Amendment's enforcement clause).

The classic touchstone for determining whether a congressional enactment is rationally related to a proper end comprehended by a constitutional provision is Chief Justice Marshall's formulation in *McCulloch v. Maryland:*

> We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But . . . . [l]et the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

The Supreme Court has specifically turned to Chief Justice Marshall's exposition in discussing the reach and limits of congressional power under section five of the Fourteenth Amendment, and has concluded that congressional power under this enforcement provision "ha[s] th[e] same broad scope" as that sketched in *McCulloch. Katzenbach v. Morgan,* 384 U.S. 641, 650, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828 (1966). The operative Fourteenth Amendment test is indeed little more than a paraphrasing of Chief Justice Marshall's formulation. *See id.* at 650–51, 86 S.Ct. at 1723–24; *Ex parte Virginia,* 100 U.S. 339, 345–46, 25 L.Ed. 676 (1879) (interpreting scope of congressional power under

---

1. We thus reject a contrary view of constitutional interpretation advanced in a recent dissent to a Sixth Circuit decision concerning an amendment to the FLSA, the Equal Pay Act. *See Timmer,* 104 F.3d at 845–47 (Boggs, J., concurring in part and dissenting in part). The dissent's author explained that he could not agree that Congress' "exclusive invocation of only one source of power was not only unnecessary, but completely irrelevant." *Id.* at 846. "If that were the case," he contended, "then any such statement . . .

would always be mere surplusage and a court would always be free to rummage through the Constitution to find some clause that the court thinks might support the exercise of power." *Id.* While the reasoning in the *Timmer* dissent has some surface appeal, we choose not to embrace it in light of the contrary Supreme Court and First Circuit precedent that we consider above. *See Wyoming,* 460 U.S. at 243–44 n. 18, 103 S.Ct. at 1064 n. 18; *Woods,* 333 U.S. at 144, 68 S.Ct. at 424; *Ramirez,* 715 F.2d at 698.

the enforcement clauses of the Reconstruction Amendments). In *Morgan*, the Supreme Court articulated a three-pronged test for determining whether congressional legislation is enacted to enforce the Fourteenth Amendment's Equal Protection Clause. Specifically, the Court determined that a congressional enactment is "appropriate legislation" under section five for Equal Protection purposes in the following circumstances: (1) if it "may be regarded as an enactment to enforce the Equal Protection Clause," (2) if it "is 'plainly adapted to that end,'" and (3) if it "is not prohibited by but is consistent with 'the letter and spirit of the constitution.'" *Morgan*, 384 U.S. at 651, 86 S.Ct. at 1724 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 421).[2]

The Sixth Circuit has concluded that the three *Morgan* factors effectively reworked the longstanding constitutional test we have outlined above by requiring something more than a rational relationship between a congressional enactment and the ends comprehended by the Fourteenth Amendment. *See Wilson–Jones*, 99 F.3d at 209 ("It is clear to us that these three ... factors cannot be kept so permissive as to make them collapse into the 'rationally related' test generally used for the enforcement clauses of other constitutional amendments."). What was clear to the Sixth Circuit panel is not so easy to discern because our review of Supreme Court precedent, as indicated above, convinces us that *Morgan* does not treat section five differently than other enforcement clauses and does not depart from the traditional formulation of such clauses' broad scope. Were the Sixth Circuit panel correct, we would have to conclude that *Morgan* essentially overruled *Ex parte Virginia* and its progeny *sub silentio*.

We do not read *Morgan* to accomplish what the Sixth Circuit suggests. *See Ramirez* 715 F.2d at 698 ("The sweep of [*Ex parte Virginia*'s] mandate was reaffirmed in *Katzenbach v. Morgan*."). Pointing to *Ex parte Virginia*, the *Morgan* Court explained that "congressional power under § 5 ha[s] th[e] same broad scope" as *McCulloch* determined Congress has under the Commerce Clause, as *South Carolina v. Katzenbach* determined Congress has under section two of the Fifteenth Amendment, *see* 383 U.S. at 326, 86 S.Ct. at 817–18, and as *James Everard's Breweries*, *see* 265 U.S. at 558–59, 44 S.Ct. at 631, determined Congress had under the enforcement clause of the now-repealed Eighteenth Amendment. *See Morgan* 384 U.S. at 650–51, 86 S.Ct. at 1723–24 (discussing cases). On our reading of the case, we cannot agree with the Sixth Circuit that a rearticulated and heightened Fourteenth Amendment standard now applies by virtue of *Morgan*. We thus see no reason to doubt the correctness of our decision in *Ramirez* regarding *Morgan* and the rational basis standard enunciated therein, which we reaffirm as controlling in this circuit. *See* 715 F.2d at 698.

■■■ The scope of the rational basis test, however, requires some clarification. The Sixth Circuit defends its rearticulated Fourteenth Amendment standard by highlighting the unacceptable consequences that it believes would be attendant upon retaining the rational basis standard. *See Wilson–Jones*, 99 F.3d at 209 ("If we were to say that an act is valid if it is rationally related to achieving equal protection of the laws, then § 5 becomes a license to Congress to pass any sort of legislation whatsoever."). We do not agree that the rational basis test regarding enforcement of the Fourteenth Amendment's equal protection guaranty gives Congress a license to pass any sort of legislation whatsoever. The Fourteenth Amendment does not render "every discrimination between groups of people a constitutional denial of equal protection." *Oregon v. Mitchell*, 400 U.S. 112, 127, 91 S.Ct. 260, 266, 27

---

2. This case does not directly implicate the Supreme Court's recent decision in *City of Boerne v. Flores*, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In *Boerne*, the Court held that Congress' section five power to enforce the Fourteenth Amendment does not encompass a substantive, nonremedial power to alter or redefine what constitutes a violation of the Constitu-

tion. The situation that the Court confronted in *Boerne* does not pertain here, where what is at issue is congressional power to enact a remedial scheme for the violation of federal statutory law that includes a grant of federal jurisdiction over cases involving private plaintiffs and states not consenting to suit.

L.Ed.2d 272 (1970) (opinion of Black, J.). Similarly, every congressional action that enlargens the scope of a law to encompass a new class of people—thereby eliminating a previous 'discrimination' that the law had made—is not, *ipso facto*, a means towards enforcing section five of the Fourteenth Amendment, because that provision does not "permit Congress to prohibit every discrimination between groups of people." *Id.* Put in a different fashion, " '[t]he Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies.' " *Holden v. Hardy*, 169 U.S. 366, 388, 18 S.Ct. 383, 386, 42 L.Ed. 780 (1898) (quoting *Missouri v. Lewis*, 101 U.S. 22, 31, 25 L.Ed. 989 (1879)).

When the Supreme Court first examined the Fourteenth Amendment's equal protection guaranty in the *Slaughter–House Cases*, it "suggested that the racial concern exhausted the meaning of the clause." Gerald Gunther, *Constitutional Law* 601 (12th ed.1991); *see* 83 U.S. (16 Wall.) 36, 71–72, 21 L.Ed. 394 (1873) (5–4 decision) ("[N]o one can fail to be impressed with the one pervading purpose found in [the Reconstruction Amendments], lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him.... [I]n any fair and just construction of any section or phrase of these amendments, it is necessary to look to the purpose which ... was the pervading spirit of them all, [and] the evil which they were designed to remedy.").

The Court has since moved away from this narrow conception of the Fourteenth Amendment. The Supreme Court has struck down state statutes under the Equal Protection Clause that did not classify or 'discriminate' on the basis of race, but rather on some other impermissible basis, such as sex, alienage, illegitimacy, indigency, criminal conviction, or unreasonable arbitrariness. *See, e.g., Mitchell*, 400 U.S. at 150–52, 91 S.Ct. at 278–79 (opinion of Douglas, J.) (collecting cases);

*New York City Transit Auth. v. Beazer*, 440 U.S. 568, 592 n. 39, 99 S.Ct. 1355, 1369 n. 39, 59 L.Ed.2d 587 (1979) (" '[L]egislative classifications are valid unless they bear no rational relationship to the State's objectives.' ") (quoting *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (per curiam)); *Smith v. Cahoon*, 283 U.S. 553, 566–67, 51 S.Ct. 582, 586–87, 75 L.Ed. 1264 (1931) (unanimous decision) ("[T]he constitutional guaranty of equal protection of the laws is interposed against discriminations that are entirely arbitrary.") *Gulf, Colo. & Santa Fe Ry. Co. v. Ellis*, 165 U.S. 150, 165–66, 17 S.Ct. 255, 260–61, 41 L.Ed. 666 (1897) (explaining that "the mere fact of classification" in legislation does not violate the equal protection guaranty, but "a mere arbitrary selection" does); *Atchison, Topeka & Santa Fe Ry. Co. v. Vosburg*, 238 U.S. 56, 62, 35 S.Ct. 675, 677, 59 L.Ed. 1199 (1915) (same).

The scope and thrust of such decisions indicate that Equal Protection jurisprudence is not narrowly confined to traditional suspect or quasi-suspect classifications. Whereas, as is well-known, classifications aimed at "suspect" classes or those aimed at "fundamental" interests must pass strict scrutiny, *see, e.g., Loving v. Virginia*, 388 U.S. 1, 11–12, 87 S.Ct. 1817, 1823–24, 18 L.Ed.2d 1010 (1967), or, in the case of sex discrimination, intermediate review, *see, e.g., Craig v. Boren*, 429 U.S. 190, 197–99, 97 S.Ct. 451, 456–58, 50 L.Ed.2d 397 (1976), more mundane government classifications that do not target such groups or interests are subject only to more deferential rational basis review. Accordingly, government legislation or action "[i]n the area of economics and social welfare does not violate the Equal Protection Clause merely because the classifications [it makes] are imperfect," *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), because "[i]t is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949). Instead, in this subset of concerns, the Equal Protection Clause requires "that cities, states and the Federal Government must exercise

their powers so as not to discriminate between their inhabitants except upon some reasonable differentiation fairly related to the object of regulation." *Id.* at 112, 69 S.Ct. at 466 (Jackson, J., concurring). Viewed against this backdrop, "[e]qual protection of the laws means that 'no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and *under like circumstances.*'" *Walsh v. Massachusetts,* 618 F.2d 156, 158 (1st Cir.1980) (emphasis added) (quoting *Lewis,* 101 U.S. at 31).

Supreme Court precedent, however, does not narrowly limit congressional power to enforce the Equal Protection Clause to what the Clause itself prohibits. The Court has explained that legislation enacted pursuant to section five "would be upheld so long as the Court could find that the enactment 'is plainly adapted to [the] end' of enforcing the Equal Protection Clause and 'is not prohibited by but is consistent with the letter and spirit of the constitution,' regardless of whether the practices outlawed by Congress in themselves violated the Equal Protection Clause." *City of Rome v. United States,* 446 U.S. 156, 176, 100 S.Ct. 1548, 1561, 64 L.Ed.2d 119 (1980) (quoting *Morgan,* 384 U.S. at 651, 86 S.Ct. at 1724). Accordingly, we have previously explained that it is "irrelevant whether the activities which Congress seeks to forbid by legislation are themselves unconstitutional either under the Equal Protection Clause or under other provisions of the Fourteenth Amendment, for Congress' reach under the Civil War Amendments has been enlarged in order to make these accretions fully effective." *Ramirez,* 715 F.2d at 698 (citing *City of Rome,* 446 U.S. at 179, 100 S.Ct. at 1562–63; *Morgan,* 384 U.S. at 648–49, 86 S.Ct. at 1722–23).

■ In the instant case, it would be difficult to conclude that the probation officers constitute "a class of persons characterized by some unpopular trait or affiliation ... [that would] reflect any special likelihood of bias [against them] on the part of the ruling majority." *Beazer,* 440 U.S. at 593, 99 S.Ct. at 1369. In other words, the state employees are neither a "suspect class" nor do they allege a state infringement of a "fundamental interest," as those terms have been defined in Fourteenth Amendment jurisprudence. Insofar as any congressional enforcement of the Equal Protection Clause concerns the plaintiff probation officers, therefore, it would be as against unreasonable and arbitrary state action. To be a legitimate expression of Congress' section five power to enforce the Fourteenth Amendment, therefore, the 1974 amendments at issue in this case, which extended the FLSA's wage and hour provisions to states and state employees, have to be "rational means" towards the end "comprehended" in this context by the Equal Protection Clause, *South Carolina,* 383 U.S. at 324, 326, 86 S.Ct. at 816, 817–18, namely, the guaranty against "irrational," and therefore "unjustified," government action. *Ramirez,* 715 F.2d at 699.

■ The relevant Supreme Court precedents we have considered above indicate that Congress, when acting pursuant to section five of the Fourteenth Amendment, can prohibit or take measures designed to remedy unreasonable and arbitrary classifications made by states, or the effects of such classifications, and when doing so can, consistent with *Seminole Tribe,* abrogate the states' sovereign immunity to suit in federal court. Conversely, these precedents indicate that Congress' section five enforcement power, as it pertains to the Equal Protection Clause in cases not involving suspect or quasi-suspect classes or fundamental interests, is limited to the elimination of arbitrariness or the effects of arbitrary government action, and does not permit Congress to prohibit or otherwise target reasonable state decisions or practices. We believe that this limitation on Congress' power to enforce the Equal Protection Clause follows from the end that the Clause comprehends in this specific context and the corollary fact that the Fourteenth Amendment does not render "every discrimination between groups of people a constitutional denial of equal protection." *Mitchell,* 400 U.S. at 127, 91 S.Ct. at 266 (opinion of Black, J.). To reiterate, the cases discussed above indicate that every congressional action that enlargens the scope of a law to encompass a new class of people—thereby eliminating a

previous 'discrimination' that the law had made—is not, *ipso facto*, a means of enforcing the Fourteenth Amendment because section five does not "permit Congress to prohibit every discrimination between groups of people." *Id.*

██ We evaluate the FLSA amendments at issue against this framework to determine whether, in addition to being enactments made pursuant to Congress' Commerce Clause powers, they can be viewed appropriately as legislation that enforces the Equal Protection Clause. In our estimation, one would be hard-pressed to conclude that the FLSA amendments at issue here are rationally related to eliminating any arbitrary or unreasonable state action. Differences in the manner, method, and amount of payment that private sector and state employees receive, to the extent they exist, usually flow from a myriad of factors, including state budgetary concerns and the levels of public expenditure and taxation deemed proper by normal political processes. However, nothing in the record indicates that anything arbitrary or irrational explains or characterizes the states' practices in this area to the extent they may be prejudicial to state employees. Nor do we think, as the plaintiff probation officers would have us believe, that state employees and private sector employees are so similarly situated that differences in how and when they accrue premium pay for overtime violates the Equal Protection Clause's requirement that " 'no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and *under like circumstances.*' " *Walsh,* 618 F.2d at 158 (emphasis added) (quoting *Lewis,* 101 U.S. at 31); *see, e.g., Employees,* 411 U.S. at 286, 93 S.Ct. at 1618 (noting the significant difference between private employers and states as employers owing to federalism concerns). Accordingly, we conclude that we will not "attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment," *Pennhurst,* 451 U.S. at 16, 101 S.Ct. at 1539, because on the record before us there is no evidence that the 1974 FLSA amendments are rationally related to the elimination of any unreasonable and arbi-

trary state action, or the effects of such action, which Congress is empowered to remedy pursuant to section five of the Fourteenth Amendment. Thus, we do not believe that Congress can, consistent with *Seminole Tribe* and *Fitzpatrick v. Bitzer,* abrogate the states' sovereign immunity to suit in federal court in this context.

In arriving at this conclusion, our analysis does not suggest any reason or need for us to revisit our earlier pronouncements regarding the FLSA wage and hour provisions at issue here. Specifically, we have previously determined that Congress' "authority" to impose on the states the FLSA's wage and hour requirements was "squarely bottomed on the commerce clause." *New Hampshire Dep't of Employment Sec. v. Marshall,* 616 F.2d 240, 247 (1st Cir.1980). In so doing, we indicated that the FLSA provisions at issue here differed from other congressional legislation, like the Equal Pay Act, which, we explained, was applied "to the states as a legitimate exercise of congressional authority to adopt legislation enforcing the fourteenth amendment's guaranty of equal protection of the law." *Id.* (citing *Usery v. Charleston County Sch. Dist.,* 558 F.2d 1169 (4th Cir.1977); *Usery v. Allegheny County Institution Dist.,* 544 F.2d 148 (3d Cir.1976)). Today we state the corollary that we did not explicitly state in so many words in *Marshall:* whatever constitutional basis they may have in the Commerce Clause, the 1974 amendments to the FLSA in dispute again here did not apply the Act's wage and hour provisions to the states and state employees as a legitimate exercise of congressional authority to adopt legislation under section five of the Fourteenth Amendment.

This conclusion, of course, is fatal to the plaintiff probation officers' argument on appeal because in *Seminole Tribe, see* —— U.S. at —— – ——, 116 S.Ct. at 1131–32, the Supreme Court held that Congress cannot exercise its Commerce Clause power, or any of its other Article I powers, to abrogate a state's Eleventh Amendment immunity from suit in federal court, thereby overruling the contrary rule of *Union Gas. See* 491 U.S. at 15, 109 S.Ct. at 2282 (plurality opinion).

The force of the above line of reasoning helps to explain why every post-*Seminole Tribe* federal district court decision of which we are aware has dismissed private FLSA actions for lack of subject matter jurisdiction, even if the reasons stated were summary or did not always squarely address the section five, Fourteenth Amendment argument that we reject here today. *See, e.g., Raper v. Iowa,* 940 F.Supp. 1421 (S.D.Iowa 1996) (dismissing case and rejecting Fourteenth Amendment theory of the FLSA); *Chauvin v. Louisiana,* 937 F.Supp. 567, 570 (E.D.La. 1996) (same); *Powell v. Florida,* No. 95-6233-CIV-ZLOCH (S.D.Fla. August 6, 1996) (same); *Walden v. Florida Dep't of Corrections,* TCA 95-40357-WS (N.D. Fla. June 23, 1996) (same); *Moad v. Arkansas State Police Dep't,* No. LR-C-94-450, 1996 WL 819805 (E.D.Ark. May 15, 1996), *aff'd by Moad v. Arkansas State Police Dep't,* 111 F.3d 585 (8th Cir.1997) (declining to consider whether FLSA could have been enacted under Fourteenth Amendment where issue was not raised in district court and raised on appeal only in reply brief); *Bergemann v. Rhode Island,* 958 F.Supp. 61 (D.R.I. 1997) (dismissing case but not addressing Fourteenth Amendment theory); *Close v. New York,* No. 94-CV-0906, 1996 WL 481550 (N.D.N.Y. August 19, 1996) (same); *Arndt v. Wisconsin Dep't of Corrections,* No. 95-C-937-C, 1996 WL 911227 (W.D. Wisc. June 20, 1996) (same); *Stuhr v. Oregon,* No. 95-6118-TC, 1996 WL 888187 (D.Or. June 14, 1996) (same); *Ross v. Middle Tenn. St. Univ.,* No. 3-95-1203, 1996 WL 888185 (M.D. Tenn. July 17, 1996) (same).

In sum, we see no reason to doubt the correctness of these results, the Sixth Circuit's result in *Wilson–Jones, see* 99 F.3d at 211, or the conclusions of commentators who view with skepticism post-*Seminole* attempts to rescue private FLSA actions against states by recourse to arguments about section five of the Fourteenth Amendment. *See, e.g.,* Daniel J. Meltzer, *The Seminole Decision and State Sovereign Immunity,* 1996 Sup.Ct. Rev. 1, 49 & n. 230 (noting that the merits of the section five "strategy," while varying with different statutes, "would be hard to execute as to the Fair Labor Standards Act," in part because it is doubtful that "the Supreme Court would accept an argument that would so sharply limit the effective scope of *Seminole* ").

The Retroactivity of *Seminole Tribe*

■ Having concluded that *Seminole Tribe* controls, we next consider whether we should apply it retroactively to this case, which was properly pending in federal court before the Supreme Court overruled *Union Gas.* The plaintiff probation officers ask that in the event we do not agree with their section five, equal protection argument, we refrain from dismissing their federal suit by applying the equitable standards articulated in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and *Chevron Oil v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Those cases articulated a three-pronged analysis that seeks to minimize the "visit[ation of] substantial injustice and hardship upon those litigants who relied" upon a congressional statute's grant of jurisdiction. *Marathon Pipe Line,* 458 U.S. at 88, 102 S.Ct. at 2880 (plurality opinion) (Brennan, J.) (construing *Huson* ).

■ There are several difficulties with the probation officers' argument. First, the Supreme Court in recent years has largely rejected the pertinent propositions in both *Marathon Pipe Line* and *Huson. See Reynoldsville Casket Co. v. Hyde,* 514 U.S. 749, 752, 115 S.Ct. 1745, 1748, 131 L.Ed.2d 820 (1995) (describing *Huson* as having been overruled in part as stated by *Harper v. Virginia Dep't of Tax'n,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993)). Second, subject matter jurisdiction and Eleventh Amendment immunity can be raised at any time, and when raised, the issue is not whether the court had jurisdiction at some time in the past, but whether the court today still has jurisdiction. Thus, in a decision that postdates the two largely discredited cases on which the state employees in this dispute so heavily rely, the Supreme Court has emphasized that " 'a court lacks discretion to consider the merits of a case over which it is without jurisdiction, and thus, by definition, a jurisdictional ruling may never be made prospective only.' " *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 203, 108 S.Ct. 1717,

1722, 100 L.Ed.2d 178 (1988) (unanimous decision) (quoting *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 379, 101 S.Ct. 669, 676, 66 L.Ed.2d 571 (1981)). Finally, the probation officers' request contravenes our own recent pronouncement on this issue. *See Stella v. Kelley,* 63 F.3d 71, 74 (1st Cir.1995) ("When dealing with matters that govern a court's jurisdiction, there is no conceivable bar to retroactive application of a 'new,' judicially declared rule.").

### The Denial of Plaintiffs' Discovery Request

■ We next consider the probation officers' argument that the district court improperly denied their request to conduct discovery on whether Maine waived its Eleventh Amendment immunity by voluntarily participating in a federal program that expressly conditions state participation upon a state's consent to suit in federal court. We review a district court's decision to deny discovery on a dispositive motion for abuse of discretion. *See Fennell v. First Step Designs, Ltd.,* 83 F.3d 526, 530 (1st Cir.1996) (interpreting Fed.R.Civ.P. 56(f)).

The probation officers argue that a state is subject to suit in federal court where it has waived its Eleventh Amendment sovereign immunity, either expressly or implicitly by participating in a federal program conditioned on a state's consent to suit in federal court. *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146–47, 87 L.Ed.2d 171 (1985). The probation officers also argue that litigants are generally afforded the right to undertake discovery when they are faced with a jurisdictional bar. *See Gould, Inc. v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 451 (6th Cir.1988); *Majd–Pour v. Georgiana Community Hosp. Inc.,* 724 F.2d 901, 903 (11th Cir.1984) ("Although the plaintiff bears the burden of proving the court's jurisdiction, the plaintiff should be given the opportunity to discover facts that would support his allegations of jurisdiction.").

Maine law authorizes the Maine Department of Corrections to receive federal funds "to carry out federal law." *See* Me.Rev.Stat. Ann. tit. 34–A, §§ 1403(4), 1209(2)(B) & (4)(F). The probation officers contend that these statutes, even standing alone, support a finding that Maine has voluntarily subjected itself to federal court jurisdiction in lawsuits brought pursuant to the FLSA. At the very least, they contend, they should have the opportunity to undertake discovery on Maine's participation in federal programs because the State controls the information about the federal programs in which it actually participates.

■ In evaluating the merits of the probation officers' argument on this point, we begin by noting that "[t]he test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Atascadero,* 473 U.S. at 241, 105 S.Ct. at 3146. We have had previous occasion to explain that "a waiver must be unambiguously manifested, and because of that requirement a state's mere participation in a federal program ... has been held insufficient to demonstrate a state's waiver of its immunity." *WJM, Inc. v. Massachusetts Dep't of Pub. Welfare,* 840 F.2d 996, 1002 (1st Cir. 1988) (citing *Atascadero,* 473 U.S. at 244–46, 105 S.Ct. at 3148–49).[3]

■ Courts that have considered the waiver theory have confronted plaintiffs who at least had identified some federal program or statute that supposedly required a waiver of state immunity as a condition for state participation or receipt of federal money. *Cf. Manypenny v. United States,* 948 F.2d 1057, 1066–67 (8th Cir.1991) (plaintiffs identify White Earth Land Settlement Act); *Yorktown Med. Lab., Inc. v. Perales,* 948 F.2d 84, 88 (2d Cir.1991) (plaintiff identifies Boren Amendment to the Medicaid Act). *But cf. Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 731–32 (7th Cir.1994) (plaintiffs fail to name federal program or statute). The plaintiffs in this case want to undertake discovery to identify the federal programs in

---

**3.** While our subsequent decision in *Reopell v. Massachusetts,* 936 F.2d 12, 15 (1st Cir.1991) reversed one of *WJM* 's holdings regarding prejudgment interest in light of the Supreme Court's intervening decision in *Missouri v. Jenkins,* 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), we note that the proposition for which we cite *WJM* remains intact.

which Maine participates. In other words, Maine argues, the plaintiffs "not only want to conduct a fishing expedition, they want to conduct discovery in order to locate the lake in which to conduct the fishing expedition." We believe that this assessment, whatever else it may be, sufficiently describes the situation confronting us, and on these facts we cannot conclude, particularly given the stringent waiver standard articulated in *Atascadero* and *WJM,* that the district court abused its discretion in deciding to deny discovery on the plaintiffs' motion. *See Fennell,* 83 F.3d at 530.

### The State Transfer Issue

We next consider the appellants' argument that, assuming *Seminole Tribe* precludes federal jurisdiction in this FLSA action, the district court improperly dismissed the case rather than transfer it to state court. Whether a district court had authority to transfer a case to a state court is a legal question we review *de novo. See Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp.,* 44 F.3d 40, 43 (1st Cir.1995). Whether the district court should have exercised its authority to transfer a case to another court is a question we review for abuse of discretion. *See Service Employees Int'l Union v. Local 1199 N.E.,* 70 F.3d 647, 655 (1st Cir. 1995).

The probation officers' argument is flawed in several respects. First, the Federal Rules of Civil Procedure mandate that a federal court that determines it lacks subject matter jurisdiction has only one course of action left open to it: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court *shall dismiss* the action." Fed. R.Civ.P. 12(h)(3) (emphasis added).

Second, the probation officers' request runs afoul of earlier pronouncements from this and other circuits. *See Dantes v. Western Found. Corp.,* 614 F.2d 299, 301 (1st Cir.1980) (" 'Where, as here, the court lacks jurisdiction over the subject matter … [a defect] which precludes it from acting at all, *a fortiori,* a court lacks power to transfer.' ") (quoting *Atlantic Ship Rigging Co. v. McLellan,* 288 F.2d 589, 591 (3rd Cir.1961) and

citing *Panhandle E. Pipe Line Co. v. FPC,* 343 F.2d 905, 908 (8th Cir.1965)); *Klett v. Pim,* 965 F.2d 587, 591 n. 7 (8th Cir.1992) ("[A] court without subject matter jurisdiction cannot transfer a case to another court.").

Third, the probation officers overlook 28 U.S.C. § 1631, which limits a federal court's power to transfer a case "to any other such court" defined in 28 U.S.C. § 610, which, in turn, includes only other federal courts. *See Moravian Sch. Advisory Bd. v. Rawlins,* 70 F.3d 270, 274 (3d Cir.1995) (citing *McLaughlin v. ARCO Polymers, Inc.,* 721 F.2d 426, 429 (3rd Cir.1983)).

Finally, we are unpersuaded by the probation officers' reliance on a Third Circuit decision, *Weaver v. Marine Bank,* 683 F.2d 744 (3rd Cir.1982). In *Weaver,* the Third Circuit confronted an arguably similar situation in which plaintiffs had originally filed their claim in federal court believing that the court had subject matter jurisdiction under federal securities law. The Supreme Court subsequently ruled that the plaintiffs had no such claim. *See Marine Bank v. Weaver,* 455 U.S. 551, 559, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982). On remand, there was no other federal question upon which to base jurisdiction, diversity was lacking, and the Third Circuit faced the possibility that the plaintiffs' cause of action in state court would be time-barred. *See* 683 F.2d at 745–46. In this set of circumstances, the Third Circuit took the step of transferring the matter to state court pursuant to a Pennsylvania enabling statute. *See id.* at 748.

Maine does not have a statute identical to the Pennsylvania law upon which the Third Circuit relied, but the probation officers indicate that Maine has a savings statute that permits cases to be transferred to the proper court when the original action fails "for any matter of form." Me.Rev.Stat. Ann. tit. 14, § 855. The probation officers argue that the savings statute should be read to permit transfer of an action from a federal district court to a state court.

We believe this argument underestimates the importance that the Third Circuit attached to the unique nature of the Pennsyl-

vania statute on which it relied in transferring the case to state court. The Third Circuit explained that this statute, on its face, expressed "Pennsylvania's willingness to accept jurisdiction over cases improvidently brought in the federal courts," and specifically "provide[d both] that a federal court within the state may transfer erroneously filed cases to the state courts," and that matters transferred under the statute's provisions " 'shall be treated … as if originally filed in the transferee court … on the date first filed in a [federal] court.' " 683 F.2d at 748, 745, 746 (quoting 42 Pa. Cons.Stat. § 5103(a)).

In transferring the case, the Third Circuit explained that it had the authority to do so as a result of this specifically worded Pennsylvania statute and its "underlying" power as a federal court "to elect to use such a state mechanism, if available." *Id.* at 747. In this regard, the Third Circuit analogized the transfer to a situation in which a federal court certifies a question of doubtful state law to a state supreme court authorized by state law to accept it, and noted that the Supreme Court had approved certification, despite a lack of federal statutory authorization for the practice, because it " 'helps build a cooperative judicial federalism.' " *Id.* (quoting *Lehman Bros. v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974)).

The Pennsylvania enabling statute that rests at the heart of *Weaver* bears no resemblance to the Maine general savings statute in this case from which the appellants seek succor. *See* Me.Rev.Stat. Ann. tit. 14, § 855. The Maine statute makes no mention of transfer and only permits a re-filing in state court of a case that has been "defeated for any matter of form." *Id.* Neither the parties' nor our own research has uncovered any Maine caselaw that addresses whether this description would encompass the case at bar

as a matter of state law. We note, however, that on our reading of the statute we glean no manifestation of a willingness on the part of the State of Maine analogous to that of the Commonwealth of Pennsylvania to accept jurisdiction over cases improvidently filed in federal court with relation back to the time of the filing of the case in federal court. The importance of the Pennsylvania statute and its specialized provisions to the outcome in *Weaver* is evident when one considers that the Third Circuit subsequently has explicitly stated that "[a]bsent statutory authority, the traditional general rule that a court may not transfer a matter over which it lacks jurisdiction governs." *Shendock v. Director, Office of Workers' Comp. Programs,* 893 F.2d 1458, 1467 (3rd Cir.1990) (en banc).

■ While we express no view on the question of whether the Third Circuit's analysis in *Weaver* warrants our agreement,[4] we believe that there can be no question that, in the absence of any specialized state statute, "it is the duty of the trial court, if it finds that jurisdiction does not exist, *to proceed no further* but to dismiss the suit." *Joy v. Hague,* 175 F.2d 395, 396 (1st Cir.1949) (emphasis added) (citing *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 182, 56 S.Ct. 780, 782, 80 L.Ed. 1135 (1936)).

### The Motion to Amend The Complaint and *Ex parte Young*

On the eve of oral argument before this court, the plaintiffs-appellants filed an unusual motion to amend their complaint to add the Maine Commissioner of Corrections as a new party defendant. This motion constitutes an eleventh hour attempt by plaintiffs to bring their case under the aegis of the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and thereby overcome the Eleventh Amendment bar to

---

4. We note, however, that we have previously rejected as "unpersuasive" decisions from other circuits that "stand for the proposition that a court bereft of jurisdiction has an 'inherent power' to transfer" a case. *Dantes,* 614 F.2d at 301 n. 2 (criticizing *Pearce v. Director, Office of Workers' Comp. Programs,* 603 F.2d 763, 771 (9th Cir.1979) and *Dayton Power & Light Co. v. EPA,* 520 F.2d 703, 708 (6th Cir.1975)); *see also Natu-* *ral Resources Defense Council, Inc. v. EPA,* 465 F.2d 492, 495–96 (1st Cir.1972) (per curiam) (granting motion to transfer case to the District of Columbia Circuit on basis of express statutory authority, but declining to reach issue of whether federal court has an inherent power to transfer case to a transferee court having jurisdiction and venue).

their FLSA action. For the reasons that follow, we deny the motion.

■ Although not the routine, appellate courts have authority to allow amendments to complaints because " '[t]here is ... in the nature of ... appellate jurisdiction, nothing which forbids the granting of amendments.' " *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 834, 109 S.Ct. 2218, 2223, 104 L.Ed.2d 893 (1989) (quoting *Anonymous,* 1 F. Cas. 996, 997 (C.C.Mass.1812) (No. 444) (Story, Circuit Justice)). This feature of appellate court power "long predates the enactment of the Federal Rules," and stems from common law practice, which "permitted 'the superior court ... [to] make such amendments, as the court below may.' " *Newman–Green,* 490 U.S. at 834, 109 S.Ct. at 2223 (quoting *Anonymous,* 1 F. Cas. at 997) (quoting *King v. Ponsonby,* 1 Wils. 303, 95 Eng. Rep. 631 (K.B.1751)). *See* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.").

The plaintiff probation officers' argument in favor of their motion rests on three arguments. The first is the amendment authorization contained in 28 U.S.C. § 1653. The second is the doctrine of *Ex parte Young,* which allows plaintiffs to avoid the Eleventh Amendment bar by naming a state officer in his official capacity in cases where prospective declaratory and injunctive relief is sought under federal law. The third is the liberal standard of Rule 15(a) of the Federal Rules of Civil Procedure, which, in relevant part, provides:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and *leave shall be freely given when justice so requires.*

Fed.R.Civ.P. 15(a) (emphasis added).

■ While intriguing at first glance, closer inspection reveals that the plaintiffs-appellants' argument runs aground at each juncture. In the first place, 28 U.S.C. § 1653 does not allow what the probation

officers seek here. Section 1653 allows amendments to cure "[d]efective *allegations* of jurisdiction." (emphasis added). This statutory language "suggests that it addresses only incorrect statements about jurisdiction that actually exists, and not defects in the jurisdictional facts themselves." *Newman–Green,* 490 U.S. at 831, 109 S.Ct. at 2222. Specifically, the *Newman–Green* Court refused to interpret section 1653 as "empower[ing] federal courts to amend a complaint so as to produce jurisdiction where none actually existed before." *Id.*

■ The *Newman–Green* Court's interpretation of section 1653 thus precludes the amendment that the probation officers desire. The unequivocal rule of *Newman–Green* is that section 1653 does not authorize the addition or elimination of parties in order to create jurisdiction where jurisdiction does not exist. *See Newman–Green* at 830–31, 109 S.Ct. at 2221–22. This rule is fatal to the plaintiffs-appellants' argument because this is exactly the relief they seek in asking that their complaint be amended by adding the Commissioner of Corrections as a new party defendant.

■ Moreover, we reiterate our view that, where a party has had an opportunity to seek to amend its pleadings in the district court, it is not appropriate for that party belatedly to seek leave to amend on appeal pursuant to 28 U.S.C. § 1653. *See Joy,* 175 F.2d at 396. *Accord Sarnoff v. American Home Prods. Corp.,* 798 F.2d 1075, 1079 (7th Cir.1986). The appellants here, like the *Joy* appellants, "having refused to amend" before the district court, "come to this court asking leave to do what they failed to do below and attempt to create an error upon the part of the trial court because of matter never before that court." *Joy,* 175 F.2d at 396. After the Supreme Court handed down its decision in *Seminole Tribe,* and certainly after the State of Maine filed its motion to dismiss for lack of subject matter jurisdiction based upon the ruling of *Seminole Tribe,* the probation officers had every reason to "suspect[ ] a jurisdictional difficulty" with their case, but took "no reasonable opportunity to cure it before the appeal." *Sarnoff,* 798 F.2d at 1079. Under these circumstances, we believe

it is only fair and reasonable to conclude that the appellants "had fair warning in the district court and failed to act on it; enough is enough." *Id.*

Furthermore, the proposed amendment is a futile attempt to bring this case under the ambit of *Ex parte Young.* The only relief that the plaintiffs have sought in this case, prior to the filing of their proposed amendment on appeal, has been unpaid wages and liquidated damages under the FLSA. *Ex parte Young* allows a way around the bar to federal jurisdiction erected by the Supreme Court's Eleventh Amendment jurisprudence only in cases where prospective declaratory or injunctive relief is sought under federal law. *See Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1132 ("[S]ince our decision in *Ex parte Young,* we often have found federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to 'end a continuing violation of federal law.'") (internal citation omitted) (quoting *Mansour,* 474 U.S. at 68, 106 S.Ct. at 426). The *Ex parte Young* doctrine does not apply in cases where plaintiffs seek monetary relief for past violations of federal law, regardless of whether the party the plaintiffs seek to designate as a defendant is nominally a state officer sued in his official capacity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102–03, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974).

These cases preclude the probation officers' attempt to rescue their monetary claims against the State of Maine via their proposed addition of the Commissioner of Corrections as a new party defendant.[5] The plaintiffs-appellants nonetheless argue that just be-

cause they "may be deprived of recovering retroactive money damages in federal court should not also mean that they are deprived of the benefit of their efforts to have their rights under [the] FLSA declared." However, both sides to this dispute agree that there is no continuing violation of federal law, as the background litigation between them also indicates is the case. *See Blackie v. Maine,* 75 F.3d 716 (1st Cir.1996), *aff'g Blackie v. Maine,* 888 F.Supp. 203 (D.Me.1995).[6]

No declaratory relief can issue in these circumstances. *See Mansour,* 474 U.S. at 71–73, 106 S.Ct. at 427–28. The *Mansour* Court concluded that injunctive and declaratory relief could not issue for a variety of reasons that also exist in this case. First, the Court in *Mansour* noted that monetary relief was not available because it was "prohibited by the Eleventh Amendment." *Id.* at 73, 106 S.Ct. at 428. Second, the Court explained that "[b]ecause there is no continuing violation of federal law to enjoin in this case, an injunction is not available." *Id.* at 71, 106 S.Ct. at 427. Third, the Court conceded that it had construed the Declaratory Judgment Act of 1934, 28 U.S.C. § 2201, to mean that "declaratory relief may be available even though an injunction is not," but explained that it had also "held that a declaratory judgment is not available in a number of instances." *Id.* at 72, 106 S.Ct. at 428. Specifically, declaratory relief was unavailable where "the award of declaratory judgment ... would be useful in resolving the dispute over the past lawfulness of respondent's action only if it might be offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution could be computed." *Id.* at 73, 106 S.Ct. at 428. The Court concluded that "the issuance of a declaratory

---

5. In fact, the appellants concede that if we find that *Seminole Tribe* deprives this case of federal jurisdiction, then "they will not be able to recover money damages in this action."

6. We are not unmindful of the Supreme Court's recent decision in *Idaho v. Coeur d'Alene Tribe of Idaho,* —— U.S. ——, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), which cabins and limits the availability of the *Ex parte Young* doctrine even

where prospective declaratory and injunctive relief is sought against state officers in their individual capacities for allegedly ongoing violations of federal law. This new development in the Court's jurisprudence is not implicated here. Unlike *Coeur d'Alene,* this case does not involve an ongoing violation of federal law, but instead concerns a backwards-looking dispute over past FLSA violations by the State of Maine and possible overtime back pay owed the plaintiff probation officers as a result.

judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment." *Id.*

In view of the marked similarity between the situation that confronted the *Mansour* Court and that confronts us in this case, we cannot help but note *Mansour*'s admonition that "a declaratory judgment is not available when the result would be a partial 'end run'" around the rest of the Supreme Court's Eleventh Amendment jurisprudence, particularly its limitations on the *Ex parte Young* doctrine. *Id.*

■ Moreover, *Seminole Tribe* suggests that the probation officers could not seek injunctive relief, even if there were a continuing violation in this case, because the FLSA only authorizes the Secretary of Labor to seek injunctive relief, limiting employees to suits for unpaid wages and liquidated damages. *See* 29 U.S.C. §§ 216, 217; *cf. Donovan v. Brown Equip. & Serv. Tools, Inc.,* 666 F.2d 148, 155–56 (5th Cir.1982) (reviewing legislative history). In the face of this statutory scheme, the appellants' motion to amend their complaint is particularly suspect. As the Supreme Court explained in *Seminole Tribe,* "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young.*" —— U.S. at ——, 116 S.Ct. at 1132.[7]

In sum, with no right on the part of the plaintiff probation officers to seek retroactive money damages, with no continuing violation to justify injunctive relief, and with no clearly apparent right on the part of the plaintiffs to seek injunctive relief even if a continuing

violation were present, declaratory relief, as in *Green v. Mansour,* would serve no useful purpose. *See* 474 U.S. at 73, 106 S.Ct. at 428. The only possible use of declaratory relief in this case now would be for the purpose of asserting res judicata in state court proceedings. As we saw above, however, *Mansour* precludes this option as an impermissible "end run" around Eleventh Amendment jurisprudence because the result would be little different than a prohibited direct federal court award of money damages against the state to the extent it would reduce a state court proceeding into a mere accounting session "whereby damages or restitution could be computed." *Id.*

■ The Supreme Court has identified a range of circumstances, including undue delay and futility of amendment, that should preclude granting a motion to amend. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (construing Fed.R.Civ.P. 15(a)). Suffice to say that the panoply of legal arguments we have canvassed above indicates that the plaintiff probation officers' eleventh hour motion to amend to seek declaratory relief fails under more than one prong of the *Foman* standard. In particular, a declaratory judgment is unavailable where, as here, the parties agree that there is no ongoing legal violation.[8]

### Conclusion

In concluding, we stress that our decision today does not remove state employees from the aegis of the FLSA. In determining that *Seminole Tribe* controls this case and that no federal jurisdiction exists, our decision only relates to that portion of the FLSA that purports to give federal courts jurisdiction over private FLSA actions brought by employees against states. *See* 29 U.S.C. § 216(b).

---

7. We believe that the Sixth Circuit's view on this matter may thus be precluded by *Seminole Tribe. See Wilson–Jones,* 99 F.3d at 211 (arguing that state employees can invoke *Ex parte Young* to sue a state officer in federal court for injunctive relief).

8. This case thus differs from one that the Third Circuit recently confronted when it granted a motion to amend brought on appeal by state

employees seeking to add a new party defendant (the Commissioner) and a claim for prospective declaratory relief to their pending FLSA claim for overtime compensation. *See Balgowan v. New Jersey, Dep't of Transp.,* 115 F.3d 214 (3rd Cir.1997) (granting the motion to amend where there was a dispute as to whether the state was complying with FLSA wage and hour requirements).

For the reasons stated above, we conclude that the district court's decision to dismiss for lack of subject matter jurisdiction was correct, and we deny the plaintiffs-appellants' motion to amend their complaint.

Affirmed. Costs to appellee.